UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANTHONY D. AMAKER; BATISE D.
AMAKER; GRACE D. AMAKER,

                              Plaintiffs,

        -v-

ANTHONY J. ANNUCCI; JEFFREY
MCCOY; WILLIAM A. LEE; LUIS
FRANCO; and SGT. CONFORTI,

                              Defendants.

Case No. 14-CV-9692 (KMK)

OPINION & ORDER

Appearances:
Anthony D. Amaker
Beacon, NY
Pro Se Plaintiff

Batise D. Amaker
Brooklyn, NY
Pro Se Plaintiff

Grace D. Amaker
East Windsor, NJ
Pro Se Plaintiff

Kacie A. Lally, Esq.
Office of the Attorney General of New York
New York, NY
Counsel for Defendants

KENNETH M. KARAS, United States District Judge:

        Anthony D. Amaker ("Anthony"), an inmate currently incarcerated at Fishkill

Correctional Facility, Batise D. Amaker ("Batise"), and Grace D. Amaker ("Grace")

(collectively, "Plaintiffs"), filed the instant Complaint against Anthony J. Annucci ("Annucci"),

Jeffrey McCoy ("McCoy"), William A. Lee ("Lee"), Luis Franco ("Franco"), and Sgt. Conforti

("Conforti," and collectively, "Defendants"), bringing claims under 42 U.S.C. §§ 1981 and 1983

in connection with a family visit at Green Haven Correctional Facility ("Green Haven").  Grace also claims that Defendants violated the Americans with Disabilities Act and the Rehabilitation Act.  Before the Court is Defendants' Motion To Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and for an order revoking Anthony's in forma pauperis ("IFP") status (the "Motion").  (Dkt. No. 28.)  For the following reasons, Defendants' Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are drawn from Plaintiffs' Complaint, the documents appended thereto, and the filings that Plaintiffs submitted in opposition to the Motion, and are taken as true for the purpose of resolving the Motion.  On June 1, 2014, Anthony, then an inmate at Green Haven, awaited a visit from his mother and other family members.  (Compl. ¶ 6 (Dkt. No. 1).)  Anthony looked forward to taking photographs with his family and he wished to give them legal documents for an unrelated legal action.  (*Id.*)  Anthony also expected to receive from his family a "package of cakes."  (*Id.* ¶ 7.)  When no one had arrived by 1:00 P.M., Anthony, believing it was too late for a visit, decided to take a nap.  (*Id.*)

At approximately 2:00 P.M., Anthony was awakened by a correctional officer who told him that his family was present at Green Haven for their visit.  (*Id.* ¶ 8.)  Because it was already 2:00 P.M., and visits must end by 2:30 P.M., Anthony was only "able to take his package room red bag, but not the books . . . [or] legal material because it was too late to go to the package room to process the outgoing materials."  (*Id.* ¶ 9.)  Anthony arrived at the "visit room" at 2:10 P.M.  (*Id.*)  Upon arrival, he was informed by Batise and Grace that they had arrived at Green Haven at 11:45 A.M., but they had to "wait and go through an additional search procedure" beyond those provided for in the relevant New York State Department of Corrections and

2

Community Supervision ("DOCCS") regulations.  (*Id.*)  Grace and Batise were "searched by way of a camera connected to a computer to obtain and maintain personal impression[s] of the[ir] eyes."  (*See* Decl. in Reply to Defs.' Mot. To Dismiss ("Pls.' Decl.") 33, 35 (Dkt. No. 39).)[1]  Grace, who suffers from diabetes, "was unable to eat anyt[h]ing during her wait[] for the visit" and thus "her blood sugar was getting low."  (Compl. ¶ 12.)  "[F]ortunate[ly]," Grace "had eaten prior to be[ing] held . . . for so long without food or water to visit [her] son."  (Pls.' Decl. 33–34.)

Grace also told Anthony that she was prevented from bringing him the 12 cakes he expected because the cakes might contain raisins.  (Compl. ¶ 10.)  Anthony raised the issue with Conforti—who at the time was a defendant in a pending lawsuit brought by Anthony—and Conforti informed Anthony that there was a Central Office Review Committee decision "concerning no raisins in pastry."  (*Id.*)  After Anthony said to Conforti that Anthony planned to grieve the fact that he only had 20 minutes to spend with his family, Conforti responded, according to the Complaint:  "If [sic] would grieve it if I were you."  (*Id.*)

By the time Anthony returned to his family, he had only 10 minutes remaining to spend with them.  (*Id.* ¶ 11.)  Accordingly, he had insufficient time to address a number of matters he wished to discuss with them.  (*Id.*)  Specifically, he needed to speak to Batise and Grace about (1) "a business seminar on [f]ranchises" and about making "appropriate arrangement[s] for them to attend and seek employment by owning a [f]ranchise," (*id.* ¶¶ 11, 13), (2) "the selling of [his] children['s] books on the internet," (*id.* ¶ 13), and (3) "matters . . . concerning [his] life insurance

---

[1] Citations to Plaintiffs' Declaration refer to the ECF-generated page numbers on the top of each page.

and the [e]state after [their] father's death," (*id*).  This had been Anthony's first visit with Batise

since 2013 and their father's death.  (*Id.*)

After Anthony's family departed, he filed a grievance regarding the visit and later "found

out that [Green Haven] [was] taking pictures of [his] family members every time they

[came] . . . [to] visit."  (*Id.* ¶ 12.)  Anthony learned this "through other prisoners."  (*Id.*)  The

pictures taken of Grace and Batise were not returned at the conclusion of their visit.  (Pls.' Decl.

33, 35.)

### B.  Procedural History

Plaintiffs filed the instant Complaint on December 1, 2014.  (Dkt. No. 1.)  Anthony's

application for IFP status was granted on March 4, 2015.  (Dkt. No. 5.)  Pursuant to a Scheduling

Order issued by the Court on October 27, 2015, (Dkt. No. 27), Defendants filed the Motion and

accompanying papers on December 11, 2015, (Dkt. Nos. 28–30).  Plaintiffs, after securing an

extension, (Dkt. No. 33), filed their papers in opposition to the Motion on March 3, 2016, (Dkt.

Nos. 39–40.)[2]  Defendants filed their reply brief in further support of the Motion on March 25,

2016.  (Dkt. No. 41.)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that, although a complaint "does not need detailed factual

allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

[or her] entitle[ment] to relief requires more than labels and conclusions, and a formulaic

---

[2] Plaintiffs' Memorandum is signed only by Anthony, not Grace or Batise.  (*See* Dkt. No. 40.)  However, papers submitted in conjunction with the Memorandum do contain a declaration purportedly signed by Grace, as well as grievances addressing the June 1, 2014 visit, apparently filed by Grace and Batise with the "Office of Diversity Management."  (*See* Pls.' Decl. 29–36.)

recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (second alteration in original) (internal quotation marks omitted).  Instead, the Supreme Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563.  A plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.  But if a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed." *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))).

In considering Defendants' Motion, the Court is required to consider as true the factual allegations contained in the Complaint and to draw all reasonable inferences in Plaintiffs' favor. *See Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) ("We review de novo a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (italics and internal quotation marks omitted)).  Moreover, a pro se litigant's submissions "are held to less stringent standards than [those] drafted by lawyers.  Courts liberally construe pleadings and briefs submitted by pro se litigants, reading such submissions to raise the strongest arguments they suggest." *Johnson v. Schriro*, No. 12-CV-7239, 2013 WL 5718474, at *2

(S.D.N.Y. Oct. 15, 2013) (alteration in original) (italics, internal quotation marks, and citation omitted).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted). In deciding a motion to dismiss a pro se complaint, however, it is appropriate to consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (internal quotation marks omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), "allegations contained in [P]laintiffs' memorandum of law, at least where those allegations are consistent with the allegations in the complaint," *Donahue v. U.S. Dep't of Justice*, 751 F. Supp. 45, 49 (S.D.N.Y. 1990), *abrogated on other grounds by Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), information provided in Plaintiffs' declarations, *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986) (considering pro se plaintiff's submitted memorandum and affidavits), and statements by Plaintiffs "submitted in response to defendants' request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013); *see also Rodriguez v. Rodriguez*, No. 10-CV-891, 2013 WL 4779639, at *1 (S.D.N.Y. July 8, 2013) ("Although the Court is typically confined to the allegations contained within the four corners of the complaint, when analyzing the sufficiency of a pro se pleading, a court may

consider factual allegations contained in a pro se litigant's opposition papers and other court filings." (internal quotation marks and citation omitted)).

B.  Analysis

1.  Familial Association Claim

Anthony claims that his right to maintain intimate associations with his family members was violated when he, Grace, and Batise were able to meet for only 20 minutes on June 1, 2014. (*See* Compl. ¶ 11 ("Many other intimate association matters were prevented by the failure to call me timely to the visit."); *see also* Pls.' Mem. of Law ("Pls.' Opp'n") 3 (Dkt. No. 40) ("The plaintiff brings this action based upon the denial of family and intimate association rights . . . .").)  Specifically, Anthony alleges that Grace and Batise arrived at Green Haven at 11:45 A.M., but were "made to wait and go through an additional search procedure" that delayed the visit.  (Compl. ¶ 9.)  Defendants argue that their visitor registration process is a common security measure that does not infringe upon Plaintiffs' association rights, which are necessarily curtailed in the prison setting.  (Mem. of Law in Supp. of Defs.' Mot. To Dismiss ("Defs.' Mem.") 5 (Dkt. No. 29).)  The Court agrees with Defendants that Plaintiffs' shortened visit did not result in a constitutional violation.

a.  Applicable Law

It is axiomatic that an inmate "does not retain rights inconsistent with proper incarceration," and "freedom of association is among the rights least compatible with incarceration."  *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003).[3]  Thus, although the Constitution

---

[3] To the extent this claim is brought on behalf of not only Anthony, but also Grace and Batise, the Supreme Court has explained that "any attempt to forge separate standards for cases implicating the [First Amendment] rights of outsiders [and inmates] is out of step with" Supreme Court precedent.  *Thornburgh v. Abbott*, 490 U.S. 401, 410 n.9 (1989); *see also Sealey v.*

"protects certain kinds of highly personal relationships" and there exists "a right to maintain certain familial relationships, including association among members of an immediate family," "[s]ome curtailment of that freedom must be expected in the prison context." *Id.* (internal quotation marks omitted).  To the extent that a prison procedure curtails a prisoner's freedom to associate, the prisoner's constitutional right is not violated if the procedure "bear[s] a rational relation to legitimate penological interests." *Id.* at 132; *see also Patterson v. City of N.Y.*, No. 11-CV-7976, 2012 WL 3264354, at *7 (S.D.N.Y. Aug. 9, 2012) ("[L]imitations on visits that are reasonably related to a legitimate penological interest do not violate a prisoner's constitutional right.").  Moreover, the Court "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132; *see also Hunter v. City of N.Y.*, No. 10-CV-3532, 2015 WL 5697218, at *10 (S.D.N.Y. Sept. 28, 2015) (same).

### b.  Analysis

Although Plaintiff argues that no such deference is owed in this case because "no valid government objective has been put forward[]" for Green Haven's requirement that Grace and Batise be photographed and registered before their visit, (Pls.' Decl. 3–4), "the burden . . . is not on the State to prove the validity of prison regulations[,] but on the prisoner to disprove it," *Overton*, 539 U.S. at 132.  Regardless, facilities, such as Green Haven, "have a legitimate penological interest in establishing a rigorous registration process in order to safely coordinate and accurately track visits between those inside and those beyond their walls." *Myers v. City of*

---

*Olszewski*, No. 14-CV-3, 2015 WL 9484521, at *4 (W.D.N.Y. Dec. 29, 2015) ("In the prison-visitation context, the visitor's rights are necessarily tied to the inmate's [rights].").

*N.Y.*, No. 11-CV-8525, 2012 WL 3776707, at *8 (S.D.N.Y. Aug. 29, 2012); *see also Patterson*, 2012 WL 3264354, at *7 ("A prison is entitled to adopt a registration process for visitors . . . [to] prevent[] the disruption of prison administration, which constitutes a legitimate government purpose."). Because Plaintiffs do not allege "that the registration process is excessive in relation to that government purpose," their claim fails. *See Patterson*, 2012 WL 3264354, at *7; *see also Turner v. Coughlin*, No. 89-CV-772, 1992 WL 739947, at *3 (N.D.N.Y. July 6, 1992) (holding that a prison's "photo identification program" requiring certain visitors to have their photo taken did not violate the constitutional rights of visitors "since the regulation is reasonably related to a legitimate goal"), *adopted by* 1993 WL 819135 (N.D.N.Y. Mar. 15, 1993).

Moreover, courts addressing the constitutionality of prison procedures or regulations that curtail prisoners' freedom of association should also consider "whether alternative means are open to inmates to exercise" their right to associate. *Overton*, 539 U.S. at 132; *see also Pell v. Procunier*, 417 U.S. 817, 823 (1974) (regulations must be "viewed in . . . light of the alternative means of communication permitted under the regulations with persons outside the prison"). This factor more directly brings into focus the fundamental deficiency in Anthony's claim; namely, the regulation does not seriously, if at all, actually curtail his freedom to associate and to receive visitors. The regulation does not limit the number of visitors Anthony can receive, which visitors Anthony can receive, or how often Anthony can receive them. Indeed, his Complaint expressly alleges that Anthony eventually visited with Grace and Batise. And there is no indication that he cannot receive his visitors for the entire visitation period permitted if the visitors were to arrive at Green Haven earlier so as to complete the registration process earlier. Simply put, a prolonged registration process is not a constitutional violation. *See Patterson*, 2012 WL 3264354, at *7 (dismissing the plaintiff's claim asserting that a prolonged registration

process led visitors to leave prison before the visits because the plaintiff was still entitled to receive visitors and "those visitors could have seen him if they had waited for the registration process to be completed"); *see also Myers*, 2012 WL 3776707, at *8 (dismissing the plaintiff's freedom of association claim because "the fact that some visitors leave before clearing [the facility's] registration process does not convert [the plaintiff's] claim into a constitutional one").[4] Accordingly, Plaintiffs' familial association claim is dismissed.[5]

---

[4] To the extent Anthony has sought to allege a procedural due process claim in connection with a supposed denial of his visitation rights, that claim fails as well. "[C]ourts in the Second Circuit have consistently held that neither the Due Process Clause nor New York state law create a protected liberty interest for inmates with respect to contact visits." *Hernandez v. Sposasto*, No. 14-CV-4593, 2015 WL 4097784, at *4 (E.D.N.Y. July 8, 2015) (collecting cases). Moreover, Anthony's assertions that Defendants violated a consent decree as discussed in *Kozlowski v. Coughlin*, No. 81-CV-5886, 2001 WL 1506010 (S.D.N.Y. Nov. 26, 2001), as well as various prison regulations, (*see* Pls.' Opp'n 3–6; Pls.' Decl. 3–5), do not salvage any procedural due process claim. First, the consent decree was terminated in 2001. *See Kozlowski*, 2001 WL 1506010, at *5. Second, "the law is settled that the failure to follow a [DOCCS] Directive or prison regulation does not give rise to a federal constitutional claim." *Rivera v. Wohlrab*, 232 F. Supp. 2d 117, 123 (S.D.N.Y. 2002); *see also McAllister v. Call*, No. 10-CV-610, 2014 WL 5475293, at *11 (N.D.N.Y. Oct. 29, 2014) ("A [§] 1983 claim is not the appropriate forum in which to seek review of a violation of a prison regulation." (internal quotation marks omitted)).

[5] The Court notes that the Complaint includes a reference to 42 U.S.C. § 1981. (*See* Compl. ¶ 1.) To the extent Plaintiffs assert a claim under § 1981 for the events of June 1, 2014, that claim must be dismissed. "To establish a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993); *see also Estes-El v. Dumoulin*, 2012 WL 1340805, at *2 (E.D.N.Y. Apr. 18, 2012) (same); 42 U.S.C. § 1981 (ensuring to citizens equal rights "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property"). Even generously construing the Complaint's references to interference with "possible franchise[s]" and "selling of . . . children['s] books," (Compl. ¶ 13), as interference with Plaintiffs' ability to "make and enforce contracts," *Mian*, 7 F.3d at 1087, Plaintiffs do not allege that Defendants acted with the intent to discriminate against Plaintiffs on the basis of race.

### 2. Retaliation Claim

Anthony argues that Conforti's decision to deny Anthony the 12 cakes brought by his family was made in retaliation for various grievances and a lawsuit Anthony filed against Conforti and others.  (*See* Compl. ¶¶ 10, 14; *see also* Pls.' Opp'n 6–9; Pls.' Decl. 4.)  Defendants argue that Anthony has not adequately alleged that Conforti's decision was an adverse action or that there was a causal connection between Conforti's decision and any grievance filed by Anthony.  (*See* Defs.' Mem. 5–7; *see also* Reply Mem. of Law in Supp. of Defs.' Mot. To Dismiss ("Defs.' Reply") 4–5 (Dkt. No. 41).)  The Court agrees that Anthony has not alleged an adverse action and therefore Anthony's retaliation claim is dismissed.

### a. Applicable Law

To state a First Amendment retaliation claim, Anthony must allege "(1) that the speech or conduct at issue was protected, (2) that . . . [D]efendant took adverse action against . . . [P]laintiff, and (3) that there was a causal connection between the protected conduct and the adverse action."  *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (alteration omitted) (internal quotation marks omitted); *see also Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (same).  "[B]ecause virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has instructed district courts to "approach prisoner retaliation claims with skepticism and particular care."  *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (internal quotation marks omitted); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." (internal quotation marks omitted)).

### b.  Analysis

Here, Defendants do not dispute that Anthony has adequately alleged that he engaged in constitutionally protected activity based on his allegations of a "pending lawsuit," filed by Plaintiffs, (*see* Compl. ¶¶ 10, 14), and the filing of "several grievances" against Conforti, (*see* Pls.' Opp'n 7; *see also* Pls.' Decl. 4).  "The filing of lawsuits or prison grievances is a constitutionally protected activity."  *Houston v. Zen Zen*, 388 F. Supp. 2d 172, 174 (W.D.N.Y. 2005); *see also Dolan*, 794 F.3d at 294 ("It is well established that 'retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.'" (quoting *Henderson*, 89 F.3d at 80)); *Baskerville v. Blot*, 224 F. Supp. 2d 723, 731 (S.D.N.Y. 2002) (noting that a "prisoner's filing of a grievance" and "the filing of a lawsuit" are "constitutionally protected activit[ies]").

Although Anthony has adequately alleged that he engaged in protected conduct, he has failed to allege that Conforti took an "adverse action" against him in retaliation for that conduct. An action qualifies as an "adverse action" for purposes of a retaliation claim only if the action would "deter a prisoner of ordinary firmness from vindicating his or her constitutional rights through the grievance process and the courts."  *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004); *see also Muhammad v. Jenkins*, No. 12-CV-8525, 2013 WL 5225573, at *9 (S.D.N.Y. Sept. 13, 2013) (same).  Here, Conforti merely prevented Anthony's receipt of 12 cakes brought by his family from outside Green Haven.  Courts have repeatedly held that occasional deprivations of food are de minimis and do not rise to the level of adverse actions for purposes of a retaliation claim.  *See, e.g.*, *Hill v. Laird*, No. 06-CV-126, 2014 WL 1315226, at *11 (E.D.N.Y. Mar. 31, 2014) (holding that the defendants' "refusal to give [the] [p]laintiff his food" on one

occasion "[did] not rise to the level of adverse actions"); *Edwards v. Horn*, No. 10-CV-6194, 2012 WL 760172, at *14 n.13 (S.D.N.Y. Mar. 8, 2012) ("The denial of meals on two occasions, separated by more than three months, is de minimis and not actionable." (italics omitted)); *Snyder v. McGinnis*, No. 03-CV-902, 2004 WL 1949472, at *11 (W.D.N.Y. Sept. 2, 2004) (denial of food on two different days "would not chill a person of ordinary firmness from continuing to engage in First Amendment activity").[6]  Moreover, Anthony does not allege that he was denied entire meals or otherwise denied the opportunity to eat at all, but rather only that he was denied the opportunity to eat out-of-facility desserts brought by his family.  If the denial of entire meals is a de minimis action, then so too must the lesser denial of the opportunity to consume certain sweets brought from outside prison.  *Cf. Lunney v. Brureton*, No. 04-CV-2483, 2007 WL 1544629, at *21 (S.D.N.Y. May 29, 2007) ("Case law suggests that the isolated or sporadic denial of privileges do not suffice to state a claim of actionable retaliation."), *adopted by* 2007 WL 2050301 (S.D.N.Y. July 17, 2007); *Holmes v. Grant*, No. 03-CV-3426, 2006 WL 851753, at *15 (S.D.N.Y. Mar. 31, 2006) (finding that the plaintiff's allegations that the

---

[6] Plaintiffs allege that Grace was informed that she could not give Anthony the 12 cakes because they possibly contained raisins.  (Compl. ¶ 10.)  It bears noting that some prisons prohibit raisins because they may be used as an ingredient in "pruno," an alcoholic beverage brewed by inmates.  *See, e.g.*, Richard Fausset, *Prison Tries to Put Cork in Inmates' Illegal Brew*, Los Angeles Times (Dec. 23, 2002), http://articles.latimes.com/2002/dec/23/local/me-pruno23.

defendants "served him a meal without veal" did not state a claim for retaliation).[7]  Accordingly,

Anthony's retaliation claim is dismissed.[8]

---

[7] Insofar as Plaintiffs' claim could be liberally construed as asserting that the shortened visit time was in retaliation for Anthony's protected activity, (*see* Pls.' Opp'n 9 ("[P]laintiffs have stated a claim for retaliation[] because [Anthony] ha[s] engaged in protected activities prior to the[] denial of acceptable items in the package[,] [a]s well as . . . [D]efendants acting outside of the law to restrict the visit time.")), the claim is still dismissed.  The shortening of a single visit is unlikely to chill a person of ordinary firmness from exercising his First Amendment rights and thus does not rise to the level of an "adverse action" for purposes of a retaliation claim.  *See, e.g., Mateo v. Heath*, No. 11-CV-636, 2012 WL 1075836, at *4 (S.D.N.Y. Mar. 29, 2012) ("[A] single denial of visitation, even if intentional and unjustified, is nevertheless unlikely to chill a person of ordinary firmness from continuing to exercise his right to file grievances."); *Irby v. Cain*, No. 13-CV-327, 2014 WL 1028675, at *7 (M.D. La. Mar. 17, 2014) ("[C]ourts have concluded that a mere denial or cancellation of a visit is no more than de minimis adverse action that is not sufficient to support retaliation claims under § 1983." (italics omitted)).  That conclusion remains the same even when the shortened visit is considered in conjunction with the allegation that Anthony was denied receipt of 12 raisin-filled cakes.  *See McFadden v. Friedman*, No. 12-CV-685, 2015 WL 5603433, at *2 (N.D.N.Y. Sept. 23, 2015) (concluding that three separate injuries, "whether . . . consider[ed] . . . separately or together" did not constitute adverse action for purposes of retaliation claim (emphasis omitted)).

[8] The Complaint also alleges that, after Anthony informed Conforti that he planned to file a grievance addressing the abbreviated nature of his visitation, Conforti said to Anthony, "If [sic] would grieve it if I were you."  (Compl. ¶ 10.)  "It is true that some verbal threats . . . can constitute an adverse action."  *Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010); *see also Lunney*, 2007 WL 1544629, at *23 (same).  Determining which verbal threats constitute adverse action generally "depend[s] on the[] [threats'] specificity and the context in which they are uttered," *Lunney*, 2007 WL 1544629, at *23, and "[n]on-specific verbal threats . . . do not constitute adverse actions sufficient to state a retaliation claim," *Ross v. Westchester Cty. Jail*, No. 10-CV-3937, 2012 WL 86467, at *7 (S.D.N.Y. Jan. 11, 2012).

As written, the meaning of the alleged statement by Conforti is unclear.  The purported remark, as pleaded, may be a sincere (but possibly sarcastic) comment, recommending that Anthony raise his grievance with the proper authorities as opposed to Conforti, and thus the comment would not be a threat at all.  *Cf. Cruz v. Hillman*, No. 01-CV-4169, 2002 WL 31045864, at *7 (S.D.N.Y. May 16, 2002) (report and recommendation) (noting that the defendants' statement that "Green Haven is an open battlefield, so be careful" "could be viewed as a generalized threat, but it could equally be viewed as an expression of concern" (internal quotation marks omitted)).

The Court acknowledges that Anthony may have transcribed the comment incorrectly in his Complaint.  He may have intended to allege that Conforti stated that "I would not grieve it if I were you."  While the Court has a duty to liberally construe a pro se plaintiff's complaint, this duty "is not the equivalent of a duty to rewrite it." *Gordon v. City of N.Y.*, No. 10-CV-5148, 2012 WL 1068023, at *3 (E.D.N.Y. Mar. 29, 2012) (internal quotation marks omitted); *see also*

### 3.  Americans with Disabilities Act and Rehabilitation Act

Plaintiffs' Complaint alludes to a claim under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act.  (*See* Compl. ¶ 1.)  The Complaint alleges that Grace, who suffers from diabetes, was "unable to eat anyt[h]ing" while waiting for her visit with Anthony, and that her "blood sugar was getting low."  (*Id.* ¶ 12.)  Grace's claim is dismissed.

First, "[i]nsofar as [Grace] is suing the individual [D]efendants in their individual capacities, neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials," *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001); *see also Montalvo v. Lamy*, 139 F. Supp. 3d 597, 610 (W.D.N.Y. 2015) ("Under both the ADA and Rehabilitation Act, individuals may not be sued in their individual or personal capacity." (alteration omitted)), and thus those claims must be dismissed.

---

*Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) ("[T]hough we are obligated to draw the most favorable inferences that [a pro se plaintiff's] complaint supports, we cannot invent factual allegations that he has not pled.").  But even if the allegation were read as saying "I would not grieve it if I were you," the Complaint would still fail to plead an adverse action because such a statement amounts, at most, to a "vague intimation[] of some unspecified harm" which generally "[does] not rise to the level of adverse action for the purpose of a First Amendment retaliation claim," *Bumpus v. Canfield*, 495 F. Supp. 2d 316, 326 (W.D.N.Y. 2007); *compare Mateo v. Bristow*, No. 12-CV-5052, 2013 WL 3863865, at *5 (S.D.N.Y. July 16, 2013) (allegations that the defendants "intentionally slammed [the plaintiff's] radio into the ground and threatened to feed him rat poison" state a claim for adverse action), *and Hill v. Laird*, No. 06-CV-126, 2014 WL 1315226, at *8 (E.D.N.Y. Mar. 31, 2014) (threats "to file false disciplinary reports to keep [the] [p]laintiff in the SHU if [he] did not stop filing complaints" could be found by reasonable juror to deter a person of ordinary firmness), *with King v. McIntyre*, No. 11-CV-1457, 2015 WL 1781256, at *20–21 (N.D.N.Y. Apr. 8, 2015) (threat by the defendant stating that "if [the] [p]laintiff continued to write complaints, that [the] [p]laintiff would 'have a hard time here in Coxsackie'" was non-actionable), *Kemp v. LeClaire*, No. 03-CV-844, 2007 WL 776416, at *15 (W.D.N.Y. Mar. 12, 2007) (threats such as "your day is coming," "you'll be sent to your mother in a black box," and "you'll get your black ass kicked" do not constitute an adverse action (internal quotation marks omitted)), *and Bartley v. Collins*, 2006 WL 1289256, No. 95-CV-10161, at *6 (S.D.N.Y. May 10, 2006) (threats such as "we [are] going to get you, you better drop the suit," are not adverse actions (internal quotation marks omitted)).

However, to the extent Grace's claim can be read as seeking prospective injunctive relief against Defendants, (*see* Compl. ¶ 18 (seeking "[a] permanent injunction . . . prohibit[ing] against any and all form[s] of continuous discrimination based upon disabilities")), such a claim can proceed against Defendants in their official capacities, *see Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).[9]

In any event, Grace's allegations do not state a claim under the ADA or § 504 of the Rehabilitation Act. "The Rehabilitation Act and Title[] II . . . of the ADA prohibit discrimination against qualified disabled individuals by requiring that they receive 'reasonable accommodations' that permit them to have access to and take a meaningful part in public services . . . ." *Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 85 (2d Cir.), *corrected by* 511 F.3d 238 (2d Cir. 2004). "In order for a plaintiff to establish a prima facie violation under these Acts, she must demonstrate (1) that she is a 'qualified individual' with a disability; (2) that the defendants are subject to one of the Acts; and (3) that she was 'denied the opportunity to participate in or benefit from [the] defendants' services, programs, or activities, or was otherwise

---

[9] "Whether individuals can be sued *for damages* under the ADA or Rehabilitation Act in their *official capacities*, however, is unsettled in th[e] [Southern] District." *Jones v. Ng*, No. 14-CV-1350, 2015 WL 998467, at *10 n.20 (S.D.N.Y. Mar. 5, 2015) (emphases added). Assuming that such a claim can be brought, and that Grace has brought such a claim, the claim would still fail because a plaintiff cannot recover damages against a state (or state agency or official) unless "the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability." *Garcia*, 280 F.3d at 112; *accord Johnson v. Goord*, No. 01-CV-9587, 2004 WL 2199500, at *5 (S.D.N.Y. Sept. 29, 2004) (dismissing official capacity claims "under [§] 504 of the Rehabilitation Act and Title II of the ADA . . . because those laws do not provide for money damages against the state or state officials in their official capacities, absent a showing that any violation was motivated by discriminatory animus or ill will due to the disability" (citing, inter alia, *Garcia*, 280 F.3d at 108, 111–12)). Here, the Complaint does not allege that Defendants acted with discriminatory animus or ill will based on Grace's diabetes. (*See generally* Compl.)

discriminated against by [the] defendants, by reason of her disability." *Id.* (alterations omitted) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)).

The Complaint, and Plaintiffs' opposition papers, are entirely devoid of any allegation that Grace was discriminated against on the basis of her alleged disability. Grace's sole allegation is that she was "unable to eat anyt[h]ing" while she waited to visit with Anthony on June 1, 2014. (Compl. ¶ 12.) Assuming, arguendo, that Green Haven's visitation program qualifies as a service, program, or activity provided by Green Haven, Grace does not allege that she has been denied "meaningful access" to the visitation program as a result of her diabetes. *See Henrietta D.*, 331 F.3d at 273 ("[A]n otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers." (internal quotation marks omitted)). Indeed, the Complaint explicitly concedes that Grace was able to visit with Anthony. Her shortened visit that day was in no way the result of her disability, but rather was allegedly the consequence of a prolonged registration process. Moreover, there are no allegations that Green Haven actually refused to allow Grace to eat or drink anything as she waited to visit Anthony (for example, Grace does not allege she brought a light snack to eat in the event her blood sugar was low and Defendants confiscated the snack) and, even if they did, there are no allegations supporting an inference that the registration process is so long that diabetics, such as Grace, would be unable to utilize the visitation program because they cannot wait out the prolonged process without their blood sugar dropping to dangerously low levels. Because Grace has not alleged that she was denied the opportunity to participate in the visitation program on the basis of her disability, her ADA and Rehabilitation Act claims are dismissed.[10]

---

[10] The Court also notes, but need not decide, that Grace likely failed to adequately allege that she suffered from a disability under the ADA. A disability under the ADA means, as relevant to Grace's illness, a physical impairment that substantially limits one or more of the

### 4.  Fourth Amendment Claim

The Complaint alleges that Batise and Grace "had their images . . . seized without any probable cause of any wrongdoing."  (Compl. ¶ 15.)  Grace and Batise contend that they were "held against [their] will" from 11:45 A.M. to 2:10 P.M. and "made to wait until [they were] search[ed] excessively" "by way of a camera connected to a computer to obtain and maintain [a] personal impression of the[ir] eyes."  (*See* Pls.' Decl. 33, 35.)

The Fourth Amendment guarantees the right "to be secure . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  Assuming that Green Haven's requirement that Grace and Batise have their photo taken before visiting with Anthony amounted to a search or seizure, *cf. Caldarola v. Cty. of Westchester*, 343 F.3d 570, 574 (2d Cir. 2003) ("[T]he making of [a] videotape resulted in the seizure of [the plaintiff's] image."), it was not an *unreasonable* one, and so their claim must be dismissed.

---

major life activities of the individual.  *See Krikelis v. Vassar Coll.*, 581 F. Supp. 2d 476, 485 (S.D.N.Y. 2008).  The Complaint alleges only that Grace "suffers from diabetes."  (Compl. ¶ 12.)  Anthony's opposition papers add that Grace "has to manage her health through diet." (Pls.' Opp'n 10.)  Even assuming the Court can consider this allegation from the memorandum signed only by Anthony, it would likely be insufficient.  While it is true that "'eating' is a major life activity," *Krikelis*, 581 F. Supp. 2d at 485, Grace must "ple[a]d facts tending to show that [her] impairment substantially limits the major life activity," *Mabry v. Neighborhood Defender Serv.*, 769 F. Supp. 2d 381, 401 (S.D.N.Y. 2011); *see also Dancause v. Mount Morris Cent. Sch. Dist.*, 590 F. App'x 27, 28–29 (2d Cir. 2014) (dismissing ADA claim where the plaintiff failed to "allege any facts from which a court could plausibly infer that her [physical impairment] substantially limited [certain] major life activities" (emphasis omitted)).  Plaintiffs' vague allegation that Grace "manage[s] her health through diet," (Pls.' Opp'n 2), does not allow the Court to infer that her diabetes substantially impairs her ability to eat, *cf. Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 223–24 (5th Cir. 2011) (diabetes found not to be a disability under the ADA where the plaintiff had to take a once-daily insulin shot and medication, and "require[d] only modest adjustments to his diet"); *Montalvo v. Lamy*, 139 F. Supp. 3d 597, 611 (W.D.N.Y. 2015) ("Numerous federal courts have held that diabetes, even when accompanied by the use of medication and dietary restrictions, is not necessarily a disability under the ADA.").

"[R]easonableness is . . . the ultimate standard under the Fourth Amendment," *Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 71 (1992) (internal quotation marks omitted), and reasonableness is "generally determined by balancing the particular need to search or seize against the privacy interests invaded by such action," *United States v. Singletary*, 798 F.3d 55, 59 (2d Cir. 2015) (internal quotation marks omitted).  While it is true that Grace and Batise "d[id] not relinquish their Fourth Amendment rights at the prison gates," *Wood v. Clemons*, 89 F.3d 922, 928 (1st Cir. 1996), "it is equally clear that inmates and non-inmate visitors to prisons have diminished expectations of privacy in the prison setting," *United States v. DePonceau*, No. 05-CR-6124, 2008 WL 222520, at *7 (W.D.N.Y. Jan. 24, 2008), *adopted by* 2008 WL 624110 (W.D.N.Y. Mar. 5, 2008); *see also United States v. Willoughby*, 860 F.2d 15, 21 (2d Cir. 1988) ("Contacts between inmates and noninmates may justify otherwise impermissible intrusions into the noninmates' privacy.").

Moreover, the photograph requirement is a minimally intrusive means of maintaining prison security.  While more intrusive visitation procedures, such as a body cavity search or strip search would require "reasonable suspicion" to satisfy the Fourth Amendment, *see, e.g.*, *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997) ("[C]orrectional officers need[] reasonable suspicion to strip search prison visitors without violating their constitutional rights."); *Wood*, 89 F.3d at 929 ("[P]rison officials violate the Fourth Amendment when they undertake a strip search of a prison visitor without reasonable suspicion of circumstances that justify the search."), less invasive searches or seizures are constitutionally permissible conditions on visitation even if not accompanied by any reasonable suspicion, *see Spear v. Sowders*, 71 F.3d 626, 630 (6th Cir. 1995) ("Visitors can be subjected to some searches, such as a pat-down or a metal detector sweep, merely as a condition of visitation, absent any suspicion.").  As discussed earlier, prisons

have legitimate penological interests in registering and tracking visitors so as to maintain prison security.  Indeed, "[t]he need for security at a prison is sufficiently substantial to justify some type of screening process for visitors as reasonable under the Fourth Amendment."  *Jones v. Cal. Dep't of Corr.*, No. 08-CV-69, 2011 WL 902480, at *5 (E.D. Cal. Mar. 11, 2011), *adopted by* 2011 WL 1832720 (E.D. Cal. May 13, 2011); *cf. Gardner v. Dart*, No. 13-CV-7623, 2014 WL 2611222, at *2 (N.D. Ill. June 9, 2014) ("[C]onsidering the minor inconvenience to [the] [p]laintiff that he could not take his cellular telephone into the [prison] balanced against the jail's need to maintain safety and security, [the] [p]laintiff cannot establish any constitutional violations under the circumstances.").  In sum, considering the diminished expectation of privacy Grace and Batise possessed as visitors in a prison, the minimal invasion of privacy inherent in the mere taking of a photograph for registration purposes, and Green Haven's legitimate penological interest in using a registration process to maintain security at the prison in the context of inmate visitation, Plaintiffs have not sufficiently alleged a Fourth Amendment violation.  *See, e.g.*, *Cucuta v. New York City*, 25 F. Supp. 3d 400, 410 (S.D.N.Y. July 3, 2014) ("[T]he reasonableness of a search or seizure is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." (alterations and internal quotation marks omitted)).[11]

---

[11] To the extent that Grace and Batise argue that they were "held against [their] will," (Pls.' Decl. 33, 35), such a Fourth Amendment claim fails because a seizure of a person "triggering . . . Fourth Amendment[] protections occurs only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen," *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).  In other words, "[a]n individual is seized. . . only if, under the circumstances . . . a reasonable person would have believed that he [or she] was not free to leave."  *Gardiner v. Inc. Vill. of Endicott*, 50 F.3d 151, 155 (2d Cir. 1995) (internal quotation marks omitted).  That Grace and Batise had to wait over two hours before they could visit Anthony at Green Haven in no way

### 5.  IFP Status

Anthony's application to proceed in this case in forma pauperis ("IFP") was granted by the Court on March 4, 2015.  (*See* Dkt. No. 5.)  As a result, Anthony has been able to proceed without the prepayment of fees.  *See* 28 U.S.C. § 1915.  Defendants now move to revoke Anthony's IFP status on the ground that he has amassed three "strikes," requiring revocation of the status under the Prison Litigation Reform Act ("PLRA").  (*See* Defs.' Mem. 13–15.)

### a.  Applicable Law

The IFP statute waives filing fees for qualifying prisoners of limited financial means and in doing so was "designed to ensure that indigent litigants have meaningful access to the federal courts."  *Neitzke v. Williams*, 490 U.S. 319, 324 (1989).  "However, concerned by the resulting rise of an 'outsize share of [prisoner] filings' and a 'flood of nonmeritorious claims,' Congress enacted the PLRA in 1996 in order to curb abuses of the IFP privilege and ensure 'fewer and better prisoner suits.'"  *Jones v. Moorjani*, No. 13-CV-2247, 2013 WL 6569703, at *3 (S.D.N.Y. Dec. 13, 2013) (quoting *Jones v. Bock*, 549 U.S. 199, 203 (2007)), *adopted by* 2014 WL 351628 (S.D.N.Y. Jan. 31, 2014); *see also Tafari v. Hues*, 473 F.3d 440, 443 (2d Cir. 2007) (explaining that the PLRA was "designed to stem the tide of egregiously meritless lawsuits").  Towards that end, the PLRA contains a three strikes provision which states:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious,

---

constituted a seizure under the Fourth Amendment.  There are no allegations that they were not free to leave at any time or that Defendants said anything to them that indicated they were not free to leave.

or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).[12]

The only exception to the three strikes rule is where a prisoner is "under imminent danger of serious physical injury." *Id.* An imminent danger must "exist at the time the complaint is filed," *Malik v. McGinnis*, 293 F.3d 559, 563 (2d Cir. 2002). Further, the complaint "must reveal a nexus between the imminent danger it alleges and the claims it asserts." *Pettus v. Morgenthau*, 554 F.3d 293, 298 (2d Cir. 2009). "Although the feared physical injury must be 'serious,' courts 'should not make an overly detailed inquiry into whether the allegations qualify for the exception.'" *Liner v. Fischer*, No. 11-CV-6711, 2012 WL 2847910, at *3 (S.D.N.Y. July 11, 2012) (alteration omitted) (quoting *Chavis v. Chappius*, 618 F.3d 162, 169 (2d Cir. 2010)), *adopted by* 2012 WL 4849130 (S.D.N.Y. Oct. 12, 2012).

b.  Analysis

Defendants argue that the following four cases qualify as PLRA "strikes" against Anthony:  (1) *Amaker v. McDonnell*, No. 96-CV-2298 (S.D.N.Y.); (2) *Amaker v. Connelly*, No. 96-CV-2813 (S.D.N.Y.); (3) *Amaker v. Haponik*, No. 02-138 (2d Cir.); and (4) *Amaker v. Goord*, No. 02-227 (2d Cir.).  (*See* Defs.' Mem. 14.)

Taking the two appeals first, both were dismissed by the Second Circuit because they "lack[ed] an arguable basis in fact or law" (*see* Dkt. (entry for December 20, 2002) (02-138 Dkt. (2d Cir.)); Dkt. (entry for February 20, 2003) (02-227 Dkt. (2d Cir.))), and, accordingly, both

---

[12] The fact that Anthony has already been granted IFP status does not prevent application of the three strikes policy. *See, e.g.*, *Jones*, 2013 WL 6569703, at *4 n.11 ("[T]he fact that [the plaintiff] has already been granted IFP status does not preclude revocation of that status and conditional dismissal of the action if he cannot subsequently pay the fee."); *Mason v. Nitti-Richmond*, No. 09-CV-7307, 2010 WL 2595108, at *3 (S.D.N.Y. June 25, 2010) (revoking IFP status and conditionally dismissing the complaint because of three strikes rule).

appeals qualify as strikes, *see Mills v. Fischer*, 645 F.3d 176, 177 (2d Cir. 2011) (listing as a strike an "appeal . . . that was dismissed as lacking an arguable basis in fact and law").[13]

With respect to the *McDonnell* and *Connelly* cases, according to the relevant docket sheets, the two cases were dismissed pursuant to 28 U.S.C. § 1915(d).  (*See* Pls.' Decl. Ex. B at unnumbered 2, 4.)[14]  The current version of § 1915(d) addresses the district court's responsibilities in IFP cases, which include, for example, that "[t]he officers of the court shall issue and serve all process, and perform all duties in [IFP] cases."  28 U.S.C. § 1915(d).  However, before the PLRA amended § 1915 on April 25, 1996, subsection (d) provided that the court "may dismiss the case if the allegation of poverty is untrue, or if satisfied that the action is frivolous or malicious."  28 U.S.C. § 1915(d) (1995).[15]  This version of the statute was in effect when the *McDonnell* case was dismissed on April 1, 1996.  Additionally, while the *Connelly* case was dismissed on June 21, 1996, the reference to subsection (d) was likely intended to refer to this previous version of the subsection.  As noted, the current § 1915(d) addresses the court's responsibilities with respect to service and witnesses, and does not provide the district court grounds on which to dismiss IFP suits.  As suits dismissed as "frivolous or malicious," the

---

[13]  "The district court may rely on the relevant docket sheets if they indicate with sufficient clarity that the prior suits were dismissed on the grounds that they were frivolous, malicious, or failed to state a claim upon which relief may be granted." *Harris v. City of N.Y.*, 607 F.3d 18, 23–24 (2d Cir. 2010); *see also Mason*, 2010 WL 2595108, at *2 (same).

[14] More specifically, the *Connelly* docket contains an entry for a judgment that reads "Ordered, Adjudged and Decreed:  That the complaint be and it is hereby dismissed. 28 U.S.C. § 1915(d)."  (*See* Pls.' Decl. Ex. B at unnumbered 2.) The *McDonnell* docket contains an entry for an order of dismissal stating that "the complaint, filed in forma pauperis under 28 U.S.C. [§] 1915(a), is dismissed pursuant to 28 U.S.C. [§] 1915(d)."  (*See id.* at unnumbered 4.) Additionally, both contain a certification pursuant to § 1915(a) that any appeal from the order or judgment would not be taken in good faith.  (*See id.* at unnumbered 2, 4.)

[15] This is mostly analogous to what is currently contained in § 1915(e)(2).

23

*McDonnell* and *Connelly* cases qualify as strikes, bringing Anthony's total to four. *See, e.g.*, *Hartnett v. Tetreault*, No. 07-CV-952, 2009 WL 2971576, at *3 (N.D.N.Y. Sept. 11, 2009) ("[T]he dismissal of those actions pursuant to 28 U.S.C. § 1915(e)(2) constitutes two strikes under § 1915(g)."); *Burgess v. Conway*, 631 F. Supp. 2d 280, 282 (W.D.N.Y. 2009) ("Again, the[] [grounds for dismissal under § 1915(e)(2)] are fundamental defects that clearly fall within the scope of § 1915(g).").[16]  Although the previous version of § 1915(d) also allowed dismissal "if the allegation of poverty [was] untrue," Anthony does not argue in his papers that either action was actually dismissed for those reasons.  Rather, he claims that he never filed complaints in either action and that the complaints were actually dismissed for failure to prosecute, two assertions that are belied by the dockets themselves.

Accordingly, because Anthony has at least three "strikes" under the PLRA, Defendants' Motion to revoke his IFP status is granted.[17]  To the extent Plaintiffs wish to file an Amended Complaint addressing the deficiencies outlined in this Order, the entire filing fee must be paid within 30 days of the date of this Order.

---

[16] While the *McDonnell* action was dismissed on April 1, 1996, before the PLRA and its three strike provision went into effect on April 26, 1996, *see* PL 104–134, 110 Stat. 1321 (1996), the Second Circuit has held that "pre-§ 1915 dismissals for frivolousness, maliciousness, or failure to state a claim count as 'strikes' for purposes of § 1915(g)," *Welch v. Galie*, 207 F.3d 130, 132 (2d Cir. 2000) (per curiam); *see also Liner*, 2012 WL 2847910, at *2 (same).

[17] Anthony does not argue, nor does the Complaint establish, that Anthony could satisfy the "imminent danger" exception to the three strikes rule.

## III. Conclusion

In light of the foregoing analysis, the Court grants Defendants' Motion in its entirety.[18]
In light of Plaintiffs' pro se status, and because Plaintiffs have yet to file an amended complaint,
the Complaint is dismissed without prejudice. Plaintiffs are given 30 days to file an Amended
Complaint. Failure to honor this deadline could result in dismissal of this Action with prejudice.
The Clerk of Court is respectfully requested to terminate the pending Motion. (Dkt. No. 28.)

SO ORDERED.

Dated:   September 29, 2016
         White Plains, New York

KENNETH M. KARAS
United States District Judge

---

[18] Because Defendants' Motion is granted on the aforementioned grounds, the Court does
not reach Defendants' qualified immunity or exhaustion arguments.

25